UNITED STATES OF AMERICA

United States District Court

District Court of Maine, Bangor Division
Docket No. 2026 APR 17 P 3: 46

CHRISTOPHER D'ERRICO,              )
    Plaintiff                       )
                                    )
                                    )
    v.                              )
                                    )
                                    )
CITY OF BANGOR, MAINE              )
PATRICIA BRUEN                     )
GRACE INNIS and                    )
LAURA ROGGERO                      )
    Defendants                      )
_____ )

### VERIFIED COMPLAINT AND JURY DEMAND

The Plaintiff, Christopher D'Errico, on behalf of himself and his four (4) Labrador retriever emotional support animals seized ex parte by the Bangor animal control officer (the "Emotional Support Dogs,") as well as the approximate twelve (12) puppies of the Emotional Support Dogs (now adults) also seized by the animal control officer (the "Puppies,")

### NATURE OF THE ACTION

1.    This following claims against the City of Bangor Maine, its animal control officer, one of the City's prosecuting attorneys and a local activist arise out of a violation of D'Errico's civil rights by the Defendants' coordinated actions in seizing D'Errico's dogs ex parte without giving him any chance for opposition. The animal control officer simply appeared at D'Errico's broken down vehicle with two (2) police officers as a show of force and marched his Emotional Support Dogs into crates, along with the Puppies, and carried them off in a van never to be seen again.

2.    The ex parte seizure of D'Errico's animals under the color of law was accomplished by serial violations of due process, beginning with the ex parte seizure process at 17 M.R.S. §1021(4) which is reserved for only the most severe cases of animal abuse and where the animal's very life is

1

threatened. The ex parte seizure law then requires the judicial officer to enter findings in the ex parte order that the animal's condition is so grave its very life is threatened (the Original Findings.")

3.      The ex parte seizure law at §1021(4)(C) provides a remedy that prioritizes the rights of the animal owner to regain possession of the seized animal on short order of notice.  Under this procedure, the animal owner may move to dissolve or modify the ex parte seizure order, and the burden of proof shifts to the City to "substantiate" the Original Findings," i.e., that the animal required emergency seizure because its condition was so bad its very life was threatened.

4.      The District Court judge granting the ex parte order made no Original Findings. Furthermore, in the District Court judge's oral ruling, he found D'Errico was making his "best efforts" to take care of his dogs, and he also found his dogs to be "healthy and well fed," and the animal control officer testified his dogs were well trained and in "fine" condition when she seized them, they just smelled poorly – which the animal control officer was sure to add, was "not their fault."

5.      Critically, the animal control officer sought to cutoff D'Errico's right to regain possession of his dogs under §1021(4)(C) by submitting a preprinted form of proposed ex parte order that automatically scheduled a hearing at which the animal owner was required to appear to show cause why the animal should not be "permanently" seized.  However, the show cause procedure only applies to proposed animal seizures where the animal owner is given prior notice and opportunity to be heard, not to ex parte seizures which have already occurred.

6.      Where D'Errico did in fact file a Motion to Dissolve under §1021(4)(C), two successive judges of the Bangor District Court refused to grant him a hearing on his motion, and the first judge ordered D'Errico to attend the previously scheduled show cause hearing, and the second judge actually conducted the show cause hearing, quoting the relevant statute as being that for the show cause hearing, and paying mere lip service to D'Errico's Motion to Dissolve.

2

7. To state the obvious, where D'Errico proved that his dogs were healthy and well fed and in fine condition when they were seized, his dogs were not in life threatening condition. Therefore, had D'Errico been allowed to present his Motion to Dissolve under §1021(4)(C), he would have rather easily prevailed in a Motion to Dissolve the ex parte order. Indeed, where the District Court judge's oral order also found D'Errico was routinely changing the puppies bedding, he could not even have been found guilty of the lesser charge of cruelty to animals.

8. The District Court judge who conducted the show cause hearing, and who was coincidentally friends with the animal activist, decided that despite the good health of his dogs, they should still be "permanently" seized because D'Errico simply had "too many animals and too many cars." Given such a flimsy articulation of why D'Errico must lose his Emotional Support Dogs and Puppies, the District Court judge abdicated his judicial responsibilities and delegated the writing of the decision to the defendant prosecutor. In doing so, the District Court judge essentially stated in open court he would sign the decision supporting forfeiture of D'Errico's dogs regardless of what the City Attorney writes. The City Attorney then wrote a decision that invented facts from whole cloth, including a reference to "Original Findings" in the ex parte order when no such "Original Findings" actually existed.

9. In writing the decision herself, the City Attorney was not acting as prosecutor, but rather was acting a judge. Consequently, in writing the decision herself and manufacturing facts from whole cloth, the City Attorney was acting beyond the scope of her prosecutorial duties, and is therefore not protected by prosecutorial immunity.

10.   THE PARTIES

11. The Plaintiff Christopher D'Errico is an individual with a principal residence in Gilford, New Hampshire, and another residence at # in Aurora Township, Maine.

3

12.    The Defendant City of Bangor, Maine (the "City,") is a Maine municipal corporation with a principal place of business at

13.    The Defendant Tricia Bruen

14.    The Defendant Grace Innis

15.    The Defendant Laura Roggero

## JURISDICTION

16.    Because Count I – <u>Violation of Civil Rights</u> - 42 U.S.C. § 1983, Count II – <u>Violation of Fair Housing Act</u> – 42 U.S.C. §§3601 et. seq., Count III – <u>Violation of Americans with Disabilities Act (ADA)</u> 42 U.S.C. §§ 1201 et seq. is a civil action arising under the law of the United States.

17.    D'Errico has a long-term land lease on a lakefront house in Aurora Township, Maine

18.    As more fully described below, D'Errico qualifies as a disabled person under both the laws of Maine and the United States.  To this point, by way of the following letter dated April 15, 2022, D'Errico's primary care doctor - Joseph Lowne - prescribed him one or more emotional support animals to remedy his disability (the "ESA Letter" – App.#):

To Whom It May Concern: Chris D'Errico is my patient, and has been under my care since 09/2021.  I am aware of his medical history and functional restrictions brought by his medical conditions.  He meets the definition of disabled under the Americans with Disabilities Act, the Rehabilitation Act of 1973 and Fair Housing Act.

As a result of medical diagnosis, Chris has certain limitations related to stress, anxiety, trauma, diabetes and coronary artery disease.  In order to assist in alleviating these difficulties, as well as improve overall health, and to improve [his] ability to lead a better life . . . I am prescribing an ESA [emotional support animal] that will help Chris in dealing with his diagnosis better. I am very much aware of the therapeutic benefits of emotional support animals for individuals with mental and medical diagnosis such as that faced by Chris.  Please call our office with any questions that you may have regarding my recommendation that Chris should have an **emotional support animal(s)**. [Emphasis added].

4

19.    Pursuant to the ESA Letter, D'Errico had three adult Labrador retrievers who are his emotional support animals: Boomer, a chocolate colored male; Lucy – a yellow colored female; and Darla, another yellow colored female.  When Boomer and Lucy had puppies, D'Errico kept a yellow female named Blanca and she became his fourth emotional support animal.  These are D'Errico's "Emotional Support Dogs," but the seized puppies are not. Because they provide comfort to a disabled person just by their presence, the Emotional Support Dogs went with D'Errico wherever he'd go.

20.    In order to earn a meager wage from his rural home in Aurora Township, D'Errico must travel thirty miles each way to Bangor to work for Doordash. Naturally, his Emotional Support Dogs accompanied him.  Typically, one dog would sit in the front seat and two in the back, while Blanca sometimes slept on the front floor. Like a guide dog to a blind person, D'Errico's Emotional Support Dogs helped alleviate the symptoms of his disabilities and enabled him to better function in society.

21.    Because of the long distance back to Aurora Township, in order to save on time and gas money, D'Errico would regularly spend two to three nights per week in his car in Bangor.

22.    The problems for D'Errico in the present matter all arose from his attempt to earn some extra income by breeding Boomer with Lucy and Darla and selling the puppies. The only allegations that D'Errico *ever* violated Maine's animal welfare laws arose when he traveled with the puppies in his vehicle.

23.    To provide the puppies humanely clean conditions while traveling, D'Errico routinely changed their bedding made of newspaper and cardboard. This is precisely the care required by Maine law. See 17 M.R.S. § 1031(4), which states: "Minimum standards of sanitation necessary to provide **humanely clean conditions . . .** shall include periodic cleanings to remove excretions and other waste materials."

24.     In his oral decision of the Show Cause Hearing, Judge Roberts found that D'Errico was routinely changing the bedding in his vehicle when the puppies were with him. Despite such routine cleaning, however, the Durango (and the Saab) still *smelled* of excretions.

25.     The City has a "no leash" law that permits a person to have dogs off leash, provided the dogs are under the control of their owner at all times. The animal control officer for the City, Trisha Bruen, explained to Channel 5 WABI "If you choose to walk your dog off leash, **you have to be able to verbally command your dog to return to you** in the event of danger."

26.     In October 2023, D'Errico went to Bangor in his Dodge Durango SUV and brought the three Emotional Support Dogs and their puppies with him.  When he let the (then three) Emotional Support Dogs off leash to enjoy themselves, someone reported him to the animal control officer and she came to the parking lot where D'Errico was located.

27.     At that time, she advised D'Errico that he cannot travel with so many animals in his truck and must leave the Emotional Support Dogs at home when working for Door Dash.

In the context of the present matter, the animal control officer's insistence that D'Errico keep his Emotional Support Dogs at home while he is working raises an important legal issue. D'Errico is a legally disabled person under both federal and the State of Maine.  To the extent that his Emotional Support Dogs provide a medically necessary remedy for his symptoms, D'Errico was simply following his doctor's prescription.  Where the animal control officer demanded D'Errico leave his Emotional Support Dogs at home when they are medically necessary, she would deprive him of his civil right to live a full life and participate in society.

28.     Over the next few months, D'Errico either sold or gave away all of the puppies (except for Blanca), and they are all living wonderful lives with owners who love them.  On the other hand, D'Errico's puppies and Emotional Support Dogs seized by the animal control officer have

6

not been so fortunate.  They have gone from being able to roam free in the wilderness and spend their short time on earth with someone who loves, needs and cares for them, to what is in essence dog jail.

29.    The most recent offspring of the Emotional Support Dogs consisted of 5 yellow puppies and 1 black Labrador puppy.  At the time of the events on December 17, 2024, the puppies were 8 weeks old.

30.    D'Errico raised the puppies in his Aurora Township home.

31.    There is no allegation that his Aurora Township home lacked humanely clean conditions, proper space or proper shelter.

32.    On December 13, 2024 - just four days prior to the events at issue - D'Errico brought the puppies to a veterinarian in Ellsworth, Maine, who provided a record to show that each of the puppies was in good health (the "Veterinarian's Report.")

> Puppy # – Sex: Male/Female; Birthday 10/16/2024; **Color: Yellow/Black**; Species: Canine; Breed: Labrador Retriever; Age: 8 weeks and 2 days old; Weight 10.12 lbs; Medical History: general checkup; Exam: PE: **Normal, healthy pup. No defects - H/L WNL = heart rate within normal limits.** [Emphasis added]. We consider your pet's health our first concern. See [App. ].

33.    The veterinarian Reports were necessary for D'Errico's intended Employee Health Insurance Plan to sell the puppies in the States of New Hampshire and Massachusetts.

34.    On December 17, 2024, D'Errico went to Bangor to buy his grandson a Christmas present. The temperature that day was nearly sixty (60) degrees so D'Errico took the puppies with him.  However, when he approached the Walmart, his Saab stopped running. D'Errico maneuvered the car into a corner of the parking lot so he could try to fix it as well as change the puppies' bedding. He let the Emotional Support Dogs out, knowing they could navigate the parking lot off leash.

35.      An animal rights activist named Laura Roggero was in the Walmart parking lot with her daughter and saw D'Errico's Emotional Support Dogs off leash, walking around on the median strip. The daughter then exclaimed to her mother "Mom. Look. They are all off leash." Laura Roggero then called the animal control officer.

36.      The standard procedure to seize an animal under §1021 has 3 conditions. First, the animal must be in "dire" condition, which term is defined in Webster's 1828 online Dictionary as "dreadful; dismal; horrible;[1] terrible; evil in a great degree." [§1021(1)]; Second, the owner must be given prior notice to appear at a hearing "to show cause why the animal should not be taken and turned over to the applicant" [§1021(2)]. Third is the "show cause" hearing under §1021(3), where the court will determine whether the animal has been "abandoned or cruelly treated by its owner or the animal is maimed, disabled, diseased, dehydrated, malnourished or injured." It is the owner's responsibility at the hearing to "show cause" that the animal was not in such condition. See also State of Maine v. Malpher, 947 A.2d 484, 487 (2008):

> Title §1021(1) permits an [animal control officer] to apply to the District Court for authorization to take possession of an animal in **dire** circumstances. The authorized person is required to notify the animal's owner of the **proposed seizure** and of the scheduled date for a show cause hearing. §1021(2). [Emphasis added].

37.      Police reports are not admissible at the show cause hearing unless testimony is by the police report's author. See §1021(3) ("All . . . police reports . . . are admissible as evidence when the authors of these documents are available for cross-examination at a

---

[1] At the Show Cause Hearing, the animal control officer kept repeating the scene inside D'Errico's Saab. "It was horrible, it was horrible." Yet, she refused D'Errico's request to take a photograph. So, D'Errico took the only photograph of the dogs in the Walmart lot, which the animal control officer testified showed the mother dog sleeping "contentedly" in the folded down back seat with her puppies sleeping beside her. [App. ].

hearing.") Any testimony at a show cause hearing under §1021(3) about the contents of a police report by someone other than the author of the police report is hearsay.

38.    An ex parte animal seizure is reserved for only the most extreme cases where the condition of the animal is so "grave" that there is a likelihood the animal will die or suffer severe malady if not immediately rescued by a local animal control officer. Therefore, the *animal's* condition must be extremely serious – the picture conjures up images of an emaciated dog who was abandoned by its owners and unfed for many days. Such a high threshold of emergency is required for an ex parte animal seizure, because with no prior notice, the essence of due process – the right to defend one's self from the law before loss of property – is nowhere present. See §1021(4)(A):

> A state . . . animal control officer may apply to the District Court . . . for an ex parte order for authorization to take possession of any maimed, disabled, diseased, dehydrated, malnourished or injured animal or any animal whose owner has abandoned or cruelly treated it and turn it over to the applicant or any other suitable person . . .

39.    To seize an animal ex parte, the applicant must demonstrate by supporting affidavit that the condition of the animal is so serious its life is at risk.  In particular, see §1021(4)(A)(4), which provides for an ex parte seizure of animals where:

> An animal is being or has been injured, overworked, tormented, tortured, abandoned, poisoned, mutilated, or deprived of necessary sustenance, necessary medical attention, proper shelter or protection from the weather or humanely clean conditions and, **unless an ex parte order issues allowing the applicant to take possession of the animal, the animal will die**, its condition will be substantially impaired or worsened or medical attention will be necessary to restore the animal to a normal, healthy condition. [Emphasis added].

9

See also Malpher at 488 ("When the animal's condition appears to be even more **serious** [than "dire"], an authorized person may apply to the District Court . . . for an ex parte order authorizing him or her to seize the animal before a hearing has occurred.")

40.    Where the animal control officer has the initial burden to show the animal is in grave condition, the "judicial officer" also has the burden to enter a finding that the animal is indeed in grave condition at the time of seizure. See §1021(4)(A)(4) (1):

> **an order may be entered ex parte upon findings by the court** . . . that there is a reasonable likelihood that there is a danger that unless immediate action is taken: (a) The condition of [such animal] will be substantially impaired or worsened; (b) The animal's life will be jeopardized; or (c) A great degree of medical attention will be necessary to restore the animal to a normal, healthy condition [Emphasis added].

41.    As stated above, the entry of a finding of grave condition must occur *before* the Ex Parte Order may be granted. This requirement is affirmed by Malpher at 488, which states: ("Because this method involves an immediate seizure, **the judicial officer granting the order must first determine that the animal's condition or circumstances are grave.**") [Emphasis added].  This burden on the judicial officer of entering a finding *before* granting an ex parte order is similar to the burden on the judicial officer to enter a finding granting an ex parte injunction which first requires entry of a finding as to why the matter may proceed ex parte. See Maine Civ. P. Rule 65: "Every temporary restraining order granted without notice . . . shall define the injury and state why it is irreparable and why the order was granted without notice."

42.    Notably, the general provisions of §1021 under the Animal Welfare laws do not expressly define terms such as "cruelly treated," "abandoned," "maimed," etc. nor does it reference any other section of the Criminal Code where such definitions are found. However, such definitions *are* found in the Criminal Code at 17 M.R.S. § 1031 entitled "Cruelty to animals." Therefore, the

10

definition of the terms "cruelly treated," "abandoned," "maimed" etc. under §1021 are those which are found in §1031.  This is affirmed by Malpher at 488, which states:

> Additionally, **17 M.R.S. §1031**, which is within the confines of the animal welfare provisions, includes deprivation of . . . humanely clean conditions as treatment that amounts to cruelty to animals.") [Emphasis added].

43.     As a criminal statute, §1031(1) identifies the specific state(s) of mind required to violate of the statute which is that a person is guilty of cruelty to animals if that person (i) intentionally, (ii) knowingly or (iii) recklessly" violates any of the listed prohibitions - i.e., "cruelly treated," "abandoned," "malnourished," etc.  Conversely, under §17 M.R.S. § 1031(1), a person who is found to have *negligently* violated one of the enumerated prohibitions has *not* committed animal cruelty under 17 M.R.S. § 1031(1).  In Websters 1828 Dictionary, the first word defining "negligence" is "careless." Therefore, if D'Errico was found to have been careless failed to provide humanely clean conditions, he did not treat his dogs "cruelly" as that term is used in §1021.

44.     Under 17 M.R.S. § 32, a person may not be convicted of a crime unless each element of the crime is proved by the State beyond a reasonable doubt. Proof beyond a reasonable doubt "means that the charges, to a moral certainty, are almost certainly true." Id. Furthermore, under 17 M.R.S. §34 "A person is not guilty of a crime unless that person acted (i) intentionally, (ii) knowingly, (iii) recklessly or (iv) negligently, as the law defining the crime specifies.

45.     Where (i) the "negligent" failure to provide humanely clean conditions and proper shelter are excluded from the definition of "animal cruelty" under §1031(1); and (ii) the animal control officer alleged that D'Errico was negligent respecting the care of his dogs, D'Errico would at most be guilty of negligent failure to provide humanely clean conditions and proper shelter.  But since the negligent failure to provide humanely clean conditions and proper shelter does not constitute cruelty to animals under §1031, D'Errico could not have possibly been found guilty of that charge.

11

46. Notwithstanding that the Durango was en route to Bangor, the animal control officer knew D'Errico would still have to spend several hours in the Walmart parking lot with his Emotional Support Dogs and puppies waiting for it to arrive. Critically, the animal control officer also knew that Laura Roggero would be watching D'Errico the whole time. Therefore, in order to avoid pressure from her constituent, Laura Roggero, once the animal control officer realized D'Errico's Saab would not start, she immediately applied for an Ex Parte Order.

47. The animal control officer stated at ¶10 of her Affidavit: "I believe there is a reasonable likelihood that unless immediate action is taken . . . the animals' life (sic) will be jeopardized, and/or a great deal of medical attention will be necessary to restore the animal to normal healthy condition." The Affidavit then states at ¶10 the dogs' health was at risk because D'Errico's Saab wasn't running and it would soon be getting cold:

> He is now stuck in Walmart parking lot with a car that isn't running. **It will be getting very cold at night and he has no heat.** The dogs have no room to all lie down at the same time as they are on top of each other. The puppies are doing their business in the car. The conditions provided are not humanely clean conditions at all. [Emphasis added].

48. The Docket Report indicates that along with her application for Ex Parte Order, on December 17, 2024, the animal control officer also filed an unexecuted "Proposed Order" that states in pertinent part as follows: "IN THE MATTER of Christopher D'Errico, IN THE POSSESSION OF: Multiple adult dogs . . . and 5 or more puppies . . . The application for an ORDER to take possession of the above-described animal is hereby granted."

49. The Proposed Order also required D'Errico to appear at a "show cause" hearing two weeks later: "[I]t is hereby ordered that Christopher D'Errico appear in this Court on 12/31/24 at 8:30 A.M. to show cause why the above-described animal should not be seized **permanently**."

50. As set forth above, however, the notice required under §1021(2) states that the burden of proof is on the animal owner to present evidence as to why the animal "should not be seized." The addition of the word "permanently" in the notice to appear at a show cause hearing to show why the City could not keep D'Errico's dogs is an abomination of the statutory language. Where §1021(2) applies to a "proposed" animal seizure, the owner of the animal has a "hearing" to prevent such outcome. No such "hearing" can occur if the animal has already been seized ex parte under §1021(4).

51. To further its scheme to permanently seize D'Errico's dogs, the City purposefully manipulated the notice requirements of §1021(2) by stealthily adding a single word - "permanently." By forcing D'Errico to the show cause hearing that was already scheduled, Judge Faircloth enabled the City to avoid the high burden of proof on it under §1021(4)(C) to show D'Errico's dogs were in grave condition. Instead, the City was able to skate by on the low burden Show Cause Hearing under §1021(3).

52. By refusing to schedule D'Errico's Motion to Dissolve on two days' notice as required by §1021(4)(C), she cut off D'Errico's only remedy allowed by statute for the return of his dogs seized ex parte. Indeed, Judge Sylvain clearly knew she was snuffing out D'Errico's right by forcing him to the Show Cause Hearing instead of giving him the right to argue a Motion to Dissolve under §1021(4)(C).

53. Where Judge Sylvain initially described D'Errico's Motion to Dissolve by reference to §1021(4)(C), when describing the previously scheduled hearing on December 31, 2024 to which D'Errico would be compelled to appear, she refenced it would be held pursuant "§1021" to is if it was a generic term. She did not state it would be held under "§1021(4)(C)," as she did earlier.

54. D'Errico was informed by the Clerk of the District Court that there is no tape-recording dated December 17, 2024 of a hearing on the animal control officer's Application for Ex

13

Parte Order. Therefore, when Judge Meghan Sylvain signed the proposed Ex Parte Order, she did so without conducting a hearing.

55.    In doing so, Judge Sylvain entered *no* findings that described why D'Errico's dogs were in such grave condition they required immediate ex parte seizure under §1021(4) and therefore could not delay for the standard procedure under §§1021(1-3) with prior notice and hearing. Indeed, a "determination" that D'Errico's dogs were in "grave" condition would have required Judge Sylvain to carefully review the facts presented in the Affidavit and state why D'Errico's dogs were in such grave condition they required immediate seizure.

56.    Clearly, Judge Sylvain just rubber stamped the Proposed Order and did not even try to comply with §1021(4)(A) by determining *why* the situation was so desperate that the delay of prior notice and hearing would seriously jeopardize the dogs' lives.

57.    After Judge Sylvain rubber stamped the Ex Parte Order, the animal control officer returned to the parking lot with two City officers. It didn't take much to coax D'Errico's Emotional Support Dogs to go into the van and bring them to their respective jail cells. They are the friendliest and most well-trained dogs one could imagine. The animal control officer was no doubt a hero to her constituents, Laura Roggero and her daughter. Not so much, however, to D'Errico and his dogs.

58.    Maine law proscribes only *one* procedure for the owner of animals who have been seized ex parte under §1021(4)(A) to rebut the allegations in the animal control officer's Affidavit and regain possession. That is §1021(4)(C), which states:

> **On 2 days' notice or such shorter period as the court may prescribe, the applicant who obtained the ex parte order or the owner whose animal has been possessed pursuant to an ex parte order** may appear in the District Court . . . and move the dissolution or modification of the ex parte order. The court shall hear and determine the motion, and the hearing may be advanced on the docket and receive priority over other cases when the court determines that the interests of justice so require. The moving party shall submit an affidavit setting forth specific facts to substantiate such findings as would serve to modify or dissolve the order. **The**

14

**opposing party shall have the burden of presenting evidence to substantiate the original findings**. [Emphasis added].

59.    Based on the clear language of the statute, the 2-day (or 1-day) notice requirement for a Motion to Dissolve under §1021(4)(C) is not discretionary to the District Court.  Furthermore, it is noteworthy that under §1021(4)(C), not only D'Errico would have standing to dissolve or modify the Ex Parte Order, but the animal control officer would also have standing to modify the Ex Parte Order to permanently seize D'Errico's dogs.  However, she chose not to.

60.    Instead, the animal control officer chose to schedule a show cause hearing under §§1021(1-3), which hearing applies solely to a determination of whether an owner's animals "**should be seized**" after notice and opportunity to be heard. There is no language in the statute authorizing a Show Cause Hearing to determine whether D'Errico's dogs "**should be permanently seized**" after being seized without notice or hearing under §1021(4)(A)(4).

61.    Where the Proposed Order: (i) was a standardized form to effectuate an ex parte animal seizure; and (ii) had a provision requiring the owner of the seized animal to appear in court at a show cause hearing, it is likely that such scheduling was the standard practice of the City for effecting an ex parte animal seizure.

62.    A question then arises, however, because whereas (i) D'Errico's dogs were seized ex parte under §1021(4)(A); and (ii) the animal control officer was authorized to modify the Ex Parte Order to permanently seize D'Errico's dogs under §1021(4)(C), there was *no* such authority to schedule a show cause hearing under §1021(3).

63.    This then brings up another question.  Why is it the standard practice of the Bangor animal control officer to schedule an unauthorized show cause hearing under §1021(3) instead of an authorized hearing to modify the Ex Parte Order for permanent seizure under §1021(4)(C)?  Clearly,

it is to avoid the high burden of having to prove D'Errico's dogs were in "grave" condition when she seized them.

64.      Indeed, where (i) Judge Roberts found D'Errico's dogs to be healthy and well fed; and (ii) D'Errico presented a Veterinarian Report dated four days before the seizure and diagnosing each of the "five yellow and one black" 8-week old Labrador retriever puppies to be in good health, it was impossible to determine D'Errico's dogs were in "grave" condition.

65.      On December 23, 2024, D'Errico filed a Motion to Dismiss the Ex Parte Order (the "Motion to Dissolve.") D'Errico satisfied his burden of rebutting the allegations that the immediate ex parte seizure of his dogs was required because they were in such grave condition that any delay might cause them irreparable harm.  The Motion to Dissolve contained an Affidavit by D'Errico that showed the Durango had been towed to the Walmart parking lot just several hours after the animal control officer had seized his dogs.  It also contained (i) photographs showing the dogs were being raised in humanely clean conditions at his home in Aurora Township; (ii) the first page of the Veterinarian's Report showing the puppies had received a clean bill of health just four days earlier; and (iii) the ESA Letter respecting his Emotional Support Dogs.

66.      The substantial evidence in D'Errico's Motion to Dissolve proved his dogs were *not* in grave condition at the time when they were seized.

67.      Therefore, under §1021(4)(C), the burden of proof shifted to the City to substantiate the "finding" in the Ex Parte Order that D'Errico's animals were in grave condition when they were seized.  Without such findings, however, there were no "original findings" which the City would be required to substantiate in a §1021(4)(C) hearing. D'Errico's Motion to Dissolve, therefore, was but an arbitrary exercise of procedure.

68.      D'Errico's Motion to Dissolve under §1021(4)(C) went before Judge Amy Faircloth of the District Court who acknowledged the statute's 2-day notice provision, but refused to hear

16

D'Errico's motion because the District Court's schedule did not allow for such short order of notice. As stated in Order by Judge Faircloth dated December 23, 202 ("Judge Faircloth's Order") "even if the request [for return of D'Errico's dogs] was appropriately verified, the court's schedule would not allow it to be heard prior to its current hearing date."

69.     However, there was no "current" hearing date for D'Errico's Motion to Dissolve under §1021(4)(C), because the District Court cannot schedule a motion before it has even been filed.

70.     The only hearing previously scheduled was the Show Cause Hearing on December 31, 2024. Therefore, since: (i) the only hearing already scheduled was the Show Cause Hearing; (ii) Judge Faircloth refused to hear D'Errico's Motion to Dissolve on 2-days' notice as required by §1021(4)(C); and (iii) Judge Faircloth ordered D'Errico to appear at the only previously scheduled hearing which was the Show Cause Hearing.

71.     Judge Faircloth stated: "[I]t is hereby Ordered that the Court will hear this matter **pursuant to Section 1021** on December 31, 2024." In doing so, Judge Faircloth effectively snuffed out D'Errico's right to file a Motion to Dissolve under §1021(4)(C) where the burden of proof would be on the animal control officer to prove D'Errico's dogs were in grave condition at the time she seized them. However, here is the testimony of the animal control officer as to the condition of D'Errico's dogs at the time she seized them:

Attorney:     What was the state of the dogs when you removed them?

Ms. Bruen:    You know. I will give Mr. D'Errico credit for this. **His dogs are very friendly, they're well behaved.** Other than smelling poorly - which is not their fault - you know, **they were fine.** [Emphasis added].

72.     Based on above, Judge Faircloth was clearly aware of what was essentially a bait and switch that suppressed the hearing on D'Errico's Motion to Dissolve under §1021(4)(C), and replaced it with an unauthorized Show Cause hearing under §1021(4)(A)(§1021(3). Where Judge Faircloth initially acknowledged D'Errico's Motion to Dissolve was made under Section 1021(4)(C), she

17

hedged on D'Errico's right to be heard on that procedure by stating the hearing on December 31, 2024 would be "pursuant to Section 1021," not §1021(4)(C).

73.    At the Show Cause Hearing, the Animal Control Officer Served D'Errico with a Summons for Violating (i) the Livestock Animal Cruelty Statute at 7 M.R.S. 4011-E; and (ii)

74.    On December 31, 2024, a hearing was conducted by Judge Michael Roberts.[2]  As confirmed by his opening remarks, the hearing was a show cause hearing under §1021(3), not a Motion to Dissolve under §1021(4)(C).  See Transcript

| | |
|---|---|
| Judge: | We are scheduled this morning for hearing in the matter of Christopher D'Errico. **This is scheduled for a show cause hearing.** Mr. D'Errico, are you prepared to proceed? [Emphasis added]. |
| D'Errico: | Yes. I'm ready to proceed. |
| Judge: | [To the City Attorney]. Good morning . . . procedurally . . . you note that there initially was the city's application ex parte to seize the animals and the matter was scheduled for show cause today. Then Mr. D'Errico filed his motion to dissolve, which shifts the burden. |

75.    As set forth below, Judge Roberts purported to hold the Show Cause Hearing while acknowledging that D'Errico had filed a Motion to Dissolve under §1021(4)(C):

| | |
|---|---|
| Judge: | [T]here initially was the city's application ex parte to seize the animals and the matter was scheduled for show cause today. **Then Mr. D'Errico filed his motion to dissolve, which shifts the burden.** [Emphasis added]. |

76.    With respect to D'Errico's Motion to Dissolve under §1021(4)(C), the words of Judge Roberts that it merely shifted the burden of proof in the Show Cause Hearing were nonsensical.  It is the very nature of a show cause hearing under §1021(3) that the burden of proof is on the animal

---

[2]See Transcript of BANDC-CV-24-338 *City v D'Errico* 12-31-24 Tape 1 00:00 / 1:02:20.

owner. If the burden of proof is shifted from the animal owner to the City, it is no longer a show cause hearing.

77.    Clearly, the explanation for Judge Roberts' holding the Show Cause Hearing instead of the Motion to Dissolve is because it was a significantly lower burden of proof for the City. Under the circumstances, D'Errico would have easily prevailed if he was granted an opportunity to conduct a true Motion to Dissolve under §1021(4)(C) and have a hearing thereon

78.    As set forth below, Judge Roberts stated that the City could argue first, because it is "their" motion that needs to be established.

Judge:    **So, I'm going to have the city go first**, Mr. D'Errico, to establish that there's a basis for their motion. Then we'll proceed from there. [Emphasis added]. [App. ].

79.    . However, D'Errico is not aware of any "motion" filed by the animal control officer in connection with a hearing on December 31, 2024. Perhaps Judge Roberts was referencing the procedures set forth in §§1021(1-3) for holding the unauthorized Show Cause Hearing and referring to those procedures as a "motion." Perhaps he was referring to the Application for Ex Parte Order by the animal control officer.

80.    But he wasn't. Judge Roberts didn't really care that the City was there to defend an ex parte seizure of D'Errico's dogs. He would ensure the City could keep D'Errico's dogs, regardless of the proceedings before him. Thus, even though it was (i) purportedly D'Errico's Motion to Dissolve under §1021(4)(C), and (ii) the Rules of Civil Procedure at 51 provide the moving party argues first, Judge Roberts allowed the City to argue first.

81.    The City opened by claiming that its burden of proof at the hearing that day was not to substantiate the grave condition of D'Errico's dogs in the Walmart parking lot. Rather, the City

19

claimed it merely had to prove D'Errico cruelly treated his animals under the "Agricultural" Code at 7 M.R.S. §4011-E which is applicable to livestock:

> Attorney:    The evidence that the city    is presenting today will show that Mr. D'Errico has deprived these animals of proper shelter, protection from the weather, or humanely clean conditions and violating 7 M.R.S 4011-E. He treated his animals cruelly by depriving them of these basic necessities . . .

82. Consider that on the day of the Show Cause Hearing, the animal control officer had a summons served on D'Errico to appear at another show cause hearing under 7 M.R.S. §4011. If the proper statute at the Show Cause Hearing was 7 M.R.S. §4011, then the exact same charge at the second show cause hearing would be double jeopardy.

83. In order to avoid double jeopardy, it is only natural to assume that the definition of animal cruelty applicable to §1021(4) is in the Animal Welfare chapter of the Criminal Code at 17 M.R.S. §1031(1), not the Agricultural Code at 7 M.R.S. 4011.

84. At the Show Cause Hearing, the animal control officer kept repeating the scene inside D'Errico's Saab. "It was horrible, it was horrible." Yet, she refused D'Errico's request to take a photograph. [App. ].

> D'Errico:    Did you take any pictures of the puppies when they were in the car?
>
> Ms. Bruen:    For some crazy reason I did not. I was so horrified for what I saw.

85. As set forth above, the animal control officer was so horrified by the dogs in the Saab that she is mentally unable to take a photograph. D'Errico submits, however, that the true reason why the animal control officer refused to take a photograph was because she knew that the animals were all healthy, unstressed and in "fine" condition. The dogs simply smelled bad – the animal control officer was sure to add, "which is not their fault." [App. ]. However, the fact that

20

dogs smell badly will not appear on a photograph. Rather, a photograph would only prove that in fact the dogs situated themselves comfortably within the folded down back seat of the Saab and were comfortable with their mother until the animal control officer disturbed them.

86.    Since the animal control officer refused to take a picture of the alleged cramped quarters of the Saab, D'Errico took the only photograph of the dogs in the Walmart parking lot. [App.]. As confirmed by the animal control officer, this photograph showed the mother dog sleeping "contentedly" in the folded down back seat with the puppies asleep beside her. If the animal control officer *truly* was horrified by the sight of the dogs in the photograph, then she is surely in the wrong profession.

| | |
|---|---|
| D'Errico | OK, so does it appear that the puppies and the mother are laying down together and they were basically nestled in a clean sandwich? |
| Judge: | Is this a picture of the vehicle and the animals that you saw? |
| Ms. Bruen: | Well unfortunately they were not calm sleeping and laying down. They were excitable and running around and climbing on top of the adult dogs. It does look like the seat is laid down. It looks like there is a puppy underneath that's in the trunk next to a crossword puzzle from the newspaper. Of course, when I was there they were awake they were not chilled out but it's extremely crowded. |
| D'Errico: | But it's your testimony before that you said the puppies were not able to lay down, and it does show that they're laying down and it shows there's more room in the back? |
| Judge: | Just ask a question. |
| Ms. Bruen: | What was the question again, sorry? |
| D'Errico: | Does that picture show that the puppies are laying down and they're all contented? |
| Ms. Bruen: | It does not show all of them. There's only 5 dogs in the picture. |
| D'Errico: | But does it show they're all laying down contented? |
| Ms. Bruen: | **They appear to be sleeping contentedly.** [Emphasis added]. |

21

87.    Incredibly, where the health of the puppies was a critical issue in the unauthorized Show Cause Hearing, Judge Roberts sustained the objection of the City and refused to admit the Veterinarian's Report into evidence. [App. ].

| D'Errico: | . . . we just got back from the veterinarian in Ellsworth and I did show you the puppies' exams . . . normal healthy puppies. can I give that to you?" |
| Judge: | Do you have any objections? Show that to the City's Attorney. |
| Attorney: | The city would object to entering this because we don't know if they were the same puppies or not. |
| Judge: | Sustained. |
| D'Errico: | Sustained - not admissible? This is not admissible - because the date is actually the 13th. [24:45] |
| Judge: | Does not matter sir. |

88.    The pretext of objection by the City Attorney was that there was no proof the five yellow and one black 8-week old Labrador retriever puppies diagnosed to be in good health in the Veterinarian's Report are the *same* five yellow and one black 8-week old Labrador retriever puppies seized by the animal control officer just four days later.  This exclusion would therefore assume that D'Errico could have one healthy set of 5 yellow and 1 black 8-week-old Labrador Retriever puppies in the Veterinarian's Report, and a *different* set of five yellow and 1 black 8-week-old Labrador retriever puppies which were seized by the animal control officer.  Such a fantasy, however, may be proper in a court held by the Queen of Hearts, but not in a court on the territory of the United States. The exclusion of the Veterinarian's Report was obviously contrived by Judge Roberts and the City Attorney to permanently seize D'Errico's dogs.

89.    Judge Roberts orally found the following facts and ruled that the City could keep D'Errico's dogs (the "Oral Decision"):

22

**From the testimony presented the court finds Mr. D'Errico, that you're trying hard with these animals. You're giving it your best efforts. These animals are healthy and well fed.** But one of the factors the court has to consider is whether these animals have been cruelly treated and one of the considerations the court gives in terms of cruelly treated is whether you have provided humanely clean conditions for these Animals. You suggested that there were events in place on December 17th with your vehicle that a lot of somewhat temporary situation. The court has also heard that you were routinely changing bedding out and that there have been multiple witnesses that have seen you on other occasions with the animals in this condition when they were in a vehicle without proper sanitation. I'm not taking into consideration reports of police contact, which would be hearsay but direct evidence from the witnesses who were present here today.

And because this is something that's going on over the period of time I've heard described the court is satisfied that it is appropriate to order forfeiture of these animals. Mr. D'Errico, you're trying hard and here you simply have too many vehicles, too many animals, for the conditions in the situation you're in. So, I'm going to declare these animals forfeited and direct the applicant to take possession and provide for the animal sale adoption or replacement and would direct the City's attorney to prepare an order to that effect and I will sign it when I receive it.

90.    As directed by Judge Roberts, the City Attorney prepared the written decision and filed a blank copy with the District Court on January 3, 2025. No blank copy of the written decision was provided to D'Errico, nor did Judge Roberts require the City Attorney to do so. On January 7, 2025, Judge Roberts signed (i.e., rubber stamped) the proposed decision without modification and it became the "Written Decision," stating:

This matter was initiated by the City's Animal Control Officer, who filed an application for an Ex Parte Order pursuant to 17 M.R.S & 1021(4)(A)(4) to take possession of Christopher D'Errico's multiple adult dogs and puppies . . . The Ex Parte Order was issued on December 17, 2024, and the City's Animal Control Officer on December 17, 2024, took possession of four adult Labrador Retriever's, one of which was pregnant, and six puppies. Mr. D'Errico was ordered to appear in this court on December 31, 2024, to show cause why the animals should not be seized permanently . . . and instead should be returned to Mr. D'Errico's possession. On December 23, 2024, Mr. D'Errico filed paperwork that included an affidavit, which the court has treated as a motion to dissolve the ex Parte Order. Mr. D'Errico's motion was heard by the Court on December 31, 2024 . . .

The City's Animal Control Officer, Tricia Bruen, testified and her evidence showed that on December 17, 2024, four adult dogs and six puppies, all of which Mr. D'Errico had possession, were confined by Mr. D'Errico in Mr. D'Errico's silver Saab sedan in

23

the Walmart parking lot for an extended period of time. Ms. Bruen also testified that she had a long history with Mr. D'Errico having multiple dogs in his vehicle for lengthy periods of time, and that she had been lenient with him on those other occasions. Ms. Bruen testified that it was apparent from her inspection of the vehicle on December 17th that the dogs had been left to defecate and urinate inside the vehicle, based on smell emanating from the vehicle and the soiled newspapers she could see thru the windows. Ms. Bruen was concerned for the dog's welfare when she witnessed the state of the vehicle and the number of animals she could see living on top of each other through the window. Ms. Bruen testified that Mr. D'Errico's puppies smelled like urine and feces when she removed them from his care, after she removed them from his care, after she was issued the Ex Parte Order.

. . . the court herby finds that the evidence presented by the City **substantiated the Ex Parte order's findings** that that Mr. D'Errico cruelly treated these four adult dogs and six puppies that he possessed as he deprived them of proper shelter or humanely clean conditions. The Supreme Court of Maine in State of <u>Maine v. Malpher</u>, 947 A.2d 484, 488 (Me. 2008) confirmed that deprivation of humanly clean conditions equates to cruel treatment of animals. Therefore, this Court finds that Mr. D'Errico cruelly treated these animals and declares that Mr. D'Errico's rights to these animals is forfeited pursuant to 17 M.R.S §1021(3)(A).

The Court herby denies Mr. D'Errico's Motion to Dissolve the Ex Parte Oder, and (1) directs the City's Animal Control Officer to continue possession of and provide for the four adult Labrador Retrievers, and the six puppies, and any puppies that are born to the pregnant adult dog: and (2) orders that the City's Animal Control Officer may arrange for the disposal by way of sale ,adoption, or placement of these animals in accordance with 17 M.R.S & 1021(3)(A).

91.    By the fraudulent Written Decision, the City did take unlawful permanent possession of D'Errico's dogs under the color of law.

92.    The Plaintiff recently filed an appeal in the Superior Court as Docket No. ,

93.    Due to the difficulty of piecing together the collective action by the Defendants herein to deprive him of his dogs, D'Errico's appeal was dismissed on April 6, 2026 because he had not yet submitted the Blue Brief.

94.    D'Errico timely filed a Motion to Reconsider the Dismissal of his Appeal, and attached the completed Blue Brief to the Motion to Reconsider, which is currently still pending.

95.    D'Errico submits the appeal period includes the automatic fourteen (14) days D'Errico has to file a Motion for Reconsideration under the Maine Rules of Appellate Procedure.

24

96.    Upon information and belief, whereas the City was ordered not to sell D'Errico's dogs until such time as the appeal period had terminated, the City remains in possession of and/or control of D'Errico's dogs.

97.    On x x x x, D'Errico received a Facebook message from a neighbor named x x x x x in Aurora County who advised D'Errico his dogs were about to be placed for adoption.

98.    Given the fact that his Emotional Support Dogs provide him significant rlief from the symptoms of his disability, if D'Errico's Emotional Support Dogs are sold by the City or otherwise disposed of he will suffer irreparable harm.

## COUNT I – VIOLATION OF 18 U.S.C. §1983 FOR DENIAL OF DUE PROCESS BY FAILING TO ENTER ORIGINAL FINDINGS IN THE EX PARTE ORDER

99.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

100.    The District Court's approval of the Ex Parte Application to seize D'Errico's dogs was defective as to a foundational condition of the procedure.  First, the statute at §1021(4)(A) states in plain language that an Ex Parte Order for seizure of the animals may be granted, but only if the court first determines that the animal is in "grave" condition and enters that finding in the ex parte order.

101.    As per the generally accepted understanding of the word "grave," the condition of the animal must be "life-threatening." Therefore, such "grave" condition as would warrant an ex parte seizure of animals conjures up images of emaciated dogs who have been abandoned by their owners and require intravenous fluids and significant medical care to recover.

102.    Examination of the Ex Parte Order reveals that the "judicial officer" – Meghan Sylvain – did not determine D'Errico's animals are in grave condition nor was any such finding entered in the Ex Parte Order.

103. A determination by the judicial officer that the animal sought to be seized ex parte because it is in "grave" condition and the entry of the Original Findings in the ex parte order under §1021(4)(A) is not a mere formality. The Original Findings are also *the* integral requirement of §1021(4)(C) for owners to obtain the return of their animals seized ex parte under §1021(4)(A). That is because under §1021(4)(C), "the opposing party shall have the burden of presenting evidence to substantiate the **original findings**." [Emphasis added].

104. Where the burden of proof was on the City to "substantiate the original findings" in the Ex Parte Order, yet there were no "original findings" entered in the Ex Parte Order, D'Errico's Motion to Dissolve under §1021(4)(C) was all but futile.

105. The sole remedy at §1021(4)(C) for an animal owner to obtain the return of an animal wrongfully seized ex parte under §1021(4)(A) was rendered inoperable and therefore obstructed by the absence of "original findings" in the Ex Parte Order.

106. By failing to enter original findings in an ex parte animal seizure order, a district or superior court judge can effectively obstruct the entire statutory scheme of Animal Welfare Laws at Chapter 42 of the Criminal Code.

107. In light of the above, D'Errico asserts that as a matter of law, the "judicial officer" considering an ex application for the seizure of animals under §1021(4)(A)(4), must **first**: (i) determine that the subject animals are in grave condition; and (ii) enter that finding in the ex parte order **before** the judicial officer may sign the ex parte order.

108. In this sense, entry of the "Original Findings" in an ex parte order to seize animals under §1021(4)(A) rises to the level of a jurisdictional prerequisite. Until the "original findings" are entered in the ex parte order, the legal equivalent of a red traffic light or a STOP sign exists that prevents the District Court from proceeding any further to grant the ex parte order.

109.    It is only **after** the "original findings" are entered in the ex parte order when the traffic light turns green and the court obtains jurisdiction to grant the ex parte animal seizure order under §1021(4)(A).

110.    In the present case, it was impossible for Judge Faircloth or Judge Roberts to actually conduct a hearing on D'Errico's Motion to Dissolve since the burden of proof was on the City to substantiate the "original findings" in the Ex Parte Order of which there were exactly zero.

111.    When Judge Roberts delegated his judgeship to the City Attorney to write the Written Decision, she manufactured a set of "original findings out of "whole cloth" in order to cover up the truth that there were no Original Findings:

> [T]he court herby finds that the evidence presented by the City **substantiated the Ex Parte order's findings** that that Mr. D'Errico cruelly treated these four adult dogs and six puppies that he possessed as he deprived them of proper shelter or humanely clean conditions.

COUNT II – VIOLATION OF 18 USC §1983 FOR DENIAL OF DUE PROCESS BY
OBSTRUCTING D'ERRICO'S RIGHT TO REGAIN HIS DOGS UNDER §1021(4)(C)

112.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

113.    D'Errico's Motion to Dissolve under §1021(4)(C) went before District Court Judge Amy Faircloth who acknowledged the statute's 2-day notice provision, but who refused to hear D'Errico's motion because the court' had no time on its schedule.  As stated in Judge Faircloth's Order dated December 23, 2024, "even if the request [for return of D'Errico's dogs] was appropriately verified, the court's schedule would not allow it to be heard prior to **its current hearing date**." [Emphasis added].

114.    When the City acted ex parte under §1021(4)(A) to deprive D'Errico of his dogs with no prior notice or hearing, the animal welfare laws at §1021(4)(C) provided him a basic due process right to oppose such seizure. See <u>McNaughton v. Kelsey</u>, 1997 ME 182, ¶ 6, 698 A.2d 1049,

27

1052 ("The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right which the particular pertinent constitutional provision purports to protect.") The only procedure for D'Errico to regain his dogs, it is precisely the procedure he followed on December 23, 2024 by filing the Motion to Dissolve the Ex Parte Order.

115.    Although an application for Ex Parte Order under §1021(4) is made without opposition, the owner of the seized animals may file a motion under §1021(4)(C) to recover the animals "[o]n two days' notice or such shorter period as the court may prescribe." The statute at §1021(4)(C) does not state that a Motion to Dissolve is subject to the convenience of the court.

116.    In fact, the strict mandate under §1021(4)(C) states that an owner of an animal seized ex parte be given the opportunity to regain possession of the animal "on two days' notice or such *shorter* period as the court may prescribe." By enacting §1021(4)(C), the Maine Legislature clearly sought to balance the right of the animal control officer to seize an animal ex parte in emergency situations, and the prevention of the animal control officer's arbitrary exercise of power by allowing the animal owner to proceed on an extremely short two-day (or one-day) notice.

117.    The refusal by Judge Faircloth to hear D'Errico's Motion to Dissolve on two days' (or less) notice was purportedly because the Court had no time to schedule such a hearing, and D'Errico's Motion to Dissolve under §1021(4)(C) *already* had a "current hearing date."

118.    Such a statement is non-sensical. If D'Errico had just filed the Motion to Dissolve, then it was a logical fallacy to say it was already scheduled already been scheduled.  Judge Faircloth thus relied on circular logic that pretended a hearing on D'Errico's Motion to Dissolve was scheduled before it was even filed.

119.    By coercing D'Errico to attend the unauthorized Show Cause Hearing on December 31, 2024, Judge Faircloth forever snuffed out the procedure at §1021(4)(C) granting D'Errico the

28

right to insist the City "substantiate" its allegation that D'Errico's dogs were in a life-threatening condition.

120. Pursuant to §1021(4)(C), when an animal owner files a motion to dissolve or modify an Ex Parte Order, both the subject matter of the hearing and the burden of proof are reversed. The hearing for D'Errico's Motion to Dissolve under §1021(4)(C) would have focused on the (non-existent) finding by Judge Roberts in the Ex Parte Order that D'Errico's dogs were in grave condition and required immediate seizure. D'Errico presented substantial evidence in his Motion to Dissolve the Ex Parte Order to show why his dogs were *not* in grave condition. The burden of proof would have then shifted to the City to show the dogs were in such grave condition, that in order to save their lives, the animal control officer needed to immediately seize the dogs ex parte under §1021(4)(A).

121. That is a high burden of proof.

122. In light of the above, the focus of the hearing on whether D'Errico's dogs were in grave condition at the time of seizure is a much different focus than a show cause hearing under 17 M.R.S. §§1021(1-3), where the issue is simply whether D'Errico violated a certain animal welfare statute.

123. Furthermore, in a legitimate show cause hearing, the burden of proof would ultimately on D'Errico. But with respect to D'Errico's Motion to Dissolve under §1021(4)(C), if he had been given a hearing on his Motion to Dissolve the Ex Parte Order, the burden of proof would have ultimately been on the City to prove an extremely difficult fact – that D'Errico's dogs were in grave condition at the time of seizure.

124. Since D'Errico's dogs were healthy and well fed, his Motion to Dissolve should have rather easily yielded him his dogs' return. The only thing in grave condition in the Walmart parking lot on December 17, 2024 was D'Errico's Saab, not his dogs.

29

125.    The Order by Judge Faircloth concluded: "it is hereby Ordered that the Court will hear this matter **pursuant to Section 1021** on December 31, 2024."  Based on this statement, Judge Faircloth was clearly aware of what was essentially a bait and switch that suppressed the hearing on D'Errico's Motion to Dissolve, and replaced it with the unauthorized Show Cause hearing. That is because where Judge Faircloth initially acknowledged D'Errico's Motion to Dissolve was made under Section 1021(4)(C), she hedged on D'Errico's right to be heard on that procedure by stating the hearing on December 31, 2024 would be "pursuant to Section 1021" not §1021(4)(C).

126.    Where D'Errico was denied his right to bring a Motion to Dissolve under §1021(4)(C), he was denied his due process right to the *only* procedure under Maine law for the return of his dogs which were wrongfully seized ex parte under §1021(4)(A).

COUNT III – VIOLATION OF 18 USC §1983 FOR DENIAL OF DUE PROCESS BY HOLDING AN UNAUTHORIZED HEARING UNDER §1021(3) REQUIRING D'ERRICO TO SHOW CAUSE WHY HIS DOGS SHOULD NOT BE PERMANENTLY SEIZED

127.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

128.    As set forth above, if the animal control officer desired to use the lawful procedure of Maine law to "permanently seize" D'Errico's dogs, she could have filed a motion to modify the Ex Parte Order under §1021(4)(C), just as D'Errico did.

129.    The animal control officer deliberately chose not to do so.  As stated above that choice was likely dictated by her constituent and personal friend of Judge Roberts - Laura Roggero.

130.    However, having availed herself of the procedure for animal seizure under §1021(4)(A) in which no party is present to oppose the application, the animal control officer must pay the price of such unopposed litigation by having a high burden of proof to sustain the "original findings" under §1021(4)(A) in the ex parte order. There is no statutory authority that allows for the City to (i) seize an animal ex parte under §1021(4)(A); then (ii) issue notice under §1021(2) for the animal's owner to

appear at a hearing to show cause why the owner's *already* seized animal should not be "permanently" seized.

131.    Where the animal control officer chose to proceed under the unauthorized Show Cause Hearing pursuant to §1021(3) and not the authorized motion to modify the Ex Parte Order under §1021(4)(C), the Show Cause Hearing held by Judge Roberts on December 31, 2024 was void for lack of jurisdiction.

132.    The order for D'Errico to appear at a show cause hearing clearly blended the mutually exclusive provisions of §1021(4)(A) governing ex parte seizures with **no prior** notice or hearing, with 17 M.R.S. §§1021(1-3), regarding seizure of an animal **after** notice and conduct of a hearing.

133.    To state the obvious, the provisions regarding the procedure for providing the owner of an animal prior notice and a hearing **before** the animal may be seized under 17 M.R.S. §§1021(1-3), do not apply to the owner whose animal has already been seized ex parte without any notice or hearing under §1021(4)(A).

COUNT IV – VIOLATION OF 18 USC §1983 FOR DENIAL OF DUE PROCESS BY DENIAL OF NOTICE OF THE CHARGES WHERE HIS DOGS WERE SEIZED EX PARTE UNDER §1021(4), JUDGE ROBERTS RECITED §1021(3) AND THE CITY ATTORNEY CITED THE ANIMAL CRUELTY STATUTE FOR LIVESTOCK AT 5 M.R.S. §4011

134.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

135.    Under the Due Process Clause of the Fifth Amendment to the United States Constitution, criminal defendants such as D'Errico MUST be given fair notice of the standard of conduct to which they can be held accountable.

136.    Here, the only notice that D'Errico' received of charges was in the documents handed him by the animal control officer in the Walmart parking lot on December `17, 2024 when she seized

his dogs. Having been handed the Ex Parte Order signed by Judge Sylvain, D'Errico was on notice that his dogs were seized ex parte pursuant to §1021(4)(A).

137.    Such notice, in turn, required D'Errico to review the statute at §1021(4)(A). In turn, such review put him on notice that if he wanted to get his dogs back, the only way he could do so was to comply with the express language set forth in the ex parte seizure statute at §1021(4). Where the ex parte seizure occurred under §1021(4)(A), the right to dissolve or extend such ex parte seizure is in §1021(4)(C).

138.    Where D'Errico was on notice that his right to regain his dogs arose solely by the provisions of §1021(4)(C), he also was aware that all he needed to do to regain possession of his dogs was to prove was they were not in the grave condition.

139.    D'Errico did in fact comply with §1021(4)(C), because on December 23, 2024, he filed a Motion to Dissolve that Judge Faircloth refused to hear. Moreover, Judge Roberts recited at the hearing on December 31, 2024 that the statute governing determination of whether D'Errico could regain possession of his dogs was §1021(3), which is the statute providing for a show cause hearing *after* notice and opportunity to be heard.

140.    To compound the deception, the City Attorney represented at the hearing that D'Errico was being charged with animal cruelty under the Agricultural Code applicable to livestock at 7 M.R.S. 4011-E, not the Criminal Code at 17 M.R.S. §1031.

141.    As set forth at Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) "An elementary and fundamental requirement of due process in any proceeding . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action **and afford them an opportunity to present their objections**."

142.    Had Judge Sylvain complied with 17 M.R.S. 1021(4)(A) and (i) determined that D'Errico's dogs were in "grave" condition; and (ii) entered such finding in the Ex Parte Order (the

32

original findings,") then D'Errico would have had notice as to why the Ex Parte Order was issued and what facts he needed to prove to counter that charge.

143.    Because Judge Sylvain violated §1021(4)(A) by simply rubber stamping the Proposed Order, D'Errico had no notice of the precise basis for his animals being seized.

144.    Where D'Errico's dogs were seized under §1021(4)(A), that statute does not reference the term "animal cruelty." Rather, it simply refences "humanely clean conditions" and "shelter," which terms must be interpreted according to the standards in the "animal cruelty" statute at §1031.

145.    By their actions, Judges Sylvain, Faircloth and Roberts extinguished D'Errico's right to a Motion to Dissolve under §1021(4)(C) and forced him into a Show Cause Hearing under §1021(3) instead.

146.    Therefore, D'Errico had no notice that he would be subject to a much higher burden to show cause under §1021(3), rather than simply proving under §1021(4)(C) that his dogs were not in grave condition.

147.    Notwithstanding the foregoing, it was only during the opening of the Show Cause Hearing when the City Attorney claimed that legal issue was whether D'Errico violated 5 M.R.S. §4011-E. She never thereafter claimed that the legal issue was §4011E.

148.    The City Attorney only cited 7 M.R.S. §4011-E because it is part of the Agricultural Code and not, no specific state of mind was the Criminal Code required.  the City would escape the burden of having to prove that whatever D'Errico's violation of the law found by the court, i.e., humanely clean conditions, shelter §1031, it met the required state of mind of being intentional, knowing or reckless.

149.    Negligent acts otherwise in violation of 7 M.R.S. 4011-E are not violations of 17 M.R.S. §1031.

COUNT V - VIOLATION OF 18 USC §1983 FOR DENIAL OF D'ERRICO'S DUE PROCESS RIGHT TO AN IMPARTIAL ADJUDICATION WHEN JUDGE ROBERTS DELEGATED FULL AUTHORITY TO WRITE THE DECISION TO THE CITY ATTORNEY

150.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

151.    Judicial opinions are the core work-product of judges. They are much more than findings of fact and conclusions of law; they constitute the logical and analytical explanations of why a judge arrived at a specific decision. They are tangible proof to the litigants that the judge actively wrestled with their claims and arguments and made a scholarly decision based on his or her own reason and logic.

152.    The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."

153.    When a court adopts a party's proposed opinion as its own, the court vitiates the vital purposes served by judicial opinions.

154.    D'Errico's constitutional right to an impartial adjudication of his rights occurred when Judge Roberts delegated authority to write the Written Decision to the City Attorney.

155.    Judge Roberts did not give the City Attorney any guidelines or instructions as to the factual basis for why D'Errico had to forfeit his dogs.

156.    All that Judge Roberts knew was that D'Errico had "too many dogs and too many cars for [his] situation."

157.    Clearly, even though Judge Roberts is a senior member of the District Court judiciary, he was unable to determine for himself why D'Errico had to forfeit his dogs.

158.    So, he relied on the City Attorney as a crutch and instructed her to figure it out, giving her broad discretion to say what she wants and "I will sign it when I receive it."

159.    The confiscation of a healthy and well-fed animal from its owner is the antithesis of what Maine's animal welfare laws were intended to accomplish.

34

160.    Regardless of whether the irregular procedure of December 31, 2024 was entitled a "show cause hearing" or a "Motion to Dissolve hearing," D'Errico clearly won the right to have his dogs back. See e.g., Malpher at ¶19, which states: "People of common intelligence need not guess that 'cruelly treated,' in the context of a statute regulating the treatment of animals, refers to treatment that causes suffering or pain."

161.    Where Judge Roberts found D'Errico was making his "best efforts" to take care of his dogs, and that his dogs were healthy and well-fed," D'Errico could not have the intention required by §1031 to find he was "cruel" to his dogs.

162.    In addition, Judge Roberts expressly found in the Oral Order that D'Errico was "routinely" changing the puppies' bedding, which is precisely the requirement for providing humanely clean conditions under §1031. It is therefore impossible as a practical matter to also find that D'Errico (i) intentionally, (ii) knowingly or (iii) recklessly deprived his dogs of humanely clean conditions.

163.    Where these facts were not front and foremost in Judge Roberts' Oral Decision, the clear implication is that these exculpatory facts meant nothing to him.

164.    Logically, therefore, since Judge Roberts was not interested in the 100% exculpatory evidence of healthy and well-fed dogs, then like Judges Sylvain and Faircloth, he had already decided the City would keep D'Errico's dogs as their own.

165.    The seizure and keeping of D'Errico's dogs by the City was thus a forgone conclusion as soon as the animal control officer applied for the ex Parte Order.

166.    Clearly, the City chose the procedure that imposed a higher burden of proof on the animal control officer because by doing so, she could avoid any opposition from D'Errico to show how healthy and well-fed his dogs were.

167.    However, the price to the City for engaging in such procedure would require the animal control officer to put forth such evidence so that the District Court could "determine" that D'Errico's dogs were in grave condition.

168.    Judge Roberts had already adjudged that D'Errico would lose his dogs because he said to the City Attorney whatever you write I will sign it.

169.    Logically, therefore, whatever D'Errico said at trial and whatever evidence he presented did not matter.

170.    In order to accommodate the seizure of dogs in good health and fine condition, the City Attorney had to create the pertinent facts from whole cloth.

171.    As set forth above, the City Attorney misquoted the Ex Parte Order by manufacturing a set of "original findings" out of whole cloth. The City Attorney manufactured evidence from the animal control officer that she saw soiled newspaper soaked in urine and feces. To the contrary, the animal control officer's testimony that she could NOT see any soiled bedding used as newspaper. [Tape 1, P.34]:

D'Errico:    Also, the bedding does it appear to be new fresh and clean because you can still see the typographical marks on the newspaper
.

Ms. Bruen:    There's very little that you can see.

D'Errico:    But you can see it, right?

Ms. Bruen:    I can see the crossword puzzle sticking up.

D'Errico:    Would you agree that would be soiled and illegible if there were feces and urine clouding that area?

Ms. Bruen:    In this picture I see no feces and I can't tell if its wet with urine or not being a black and white picture.

36

172.    Based on the animal control officer's testimony above, she did not see any soiled bedding in D'Errico's car, yet the City Attorney specifically stated she did see soiled newspaper in the Written Decision.

173.    Furthermore, the Written Decision stated that D'Errico was in the Walmart parking lot for an extended "period," without first disclosing that he was there because his car had broken down. Moreover, where no mention was made of D'Errico's filing a Motion to Dissolve under §1021(4)(C) was ever made except for the lip service by Judge Roberts at the outset of the Show Cause Hearing, the City Attorney's description of the proceeding as a hearing on D'Errico's Motion to Dissolve is facetious.

174.    Where the Written Decision does not even mention Judge Roberts' findings D'Errico's dogs were in good health and well-fed, the City Attorney was clearly acting outside her role as prosecutor and had stepped into the role of judge. Just like Alice in Wonderland.

175.    The Written Decision reflects the application of judgment (and folly) by one of the parties – the City Attorney – who manufactured facts whole cloth to provide a pretext for the "permanent seizure of D'Errico's dogs.

## COUNT VI - THE CITY OF BANGOR VIOLATED THE AMERICANS WITH DISABILITIES ACT AT 42 U.S.C. § 12101 ADA) BY DENYING D'ERRICO EQUAL ACCESS TO PUBLIC ACCOMMODATIONS BY SEIZING HIS EMOTIONAL SUPPORT DOGS IN THE WALMART PARKING LOT

176.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

177.    There is no question that based on the ESA Letter, D'Errico qualifies as a disabled person under the Americans with Disabilities Act at §36.104 – Definitions - which states: "Disability means, with respect to an individual, a physical or mental

37

impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment."

178.    D'Errico's possession of his Emotional Support Dogs are also subject to the protections of 5 M.R.S. § 4553(1)(H)(A), which defines an "assistance animal" as "an animal that has been determined necessary for an individual with a physical or mental disability to mitigate the effects of a physical or mental disability by a physician . . . with knowledge of the disability-related need for an assistance animal." It is precisely *because* of his mental and physical disability that the Emotional Support Dogs were with him in his car.

179.    Where the animal control officer told D'Errico that he must leave his Emotional Support Dogs at home when he is working for Door Dash, that is a violation of Title 17 Crimes; Chapter 47: Discrimination M.R.S. § 1311: "It is the policy of this State to encourage and enable persons who are . . . disabled to participate fully in the social and economic life of the State and to engage in remunerative employment."

180.    See also, Constitution for the State of Maine, Section 6-A - Discrimination against persons prohibited:

> No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof.

181.    When D'Errico's car broke down in the Walmart parking lot, he was in a place of public accommodation under the Americans with Disabilities Act.

182.    D'Errico's presence in the Walmart parking lot with his Emotional Support Dogs was thus a simple exercise of his right to equal access to public accommodations under the Americans with Disabilities Act.

183.    Where the City frivolously seized D'Errico's Emotional Support Dogs ex parte while he was attempting to access a place of public accommodations, such actions constitute discrimination against a disabled person under the Americans with Disabilities Act.

## COUNT VII – VIOLATION OF FAIR HOUSING ACT AT 42 U.S.C. 3601 et seq

184.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

185.    Where D'Errico regularly spent two or three consecutive days and nights in Bangor running Door Dash in order to save travel time back to Aurora Township and save money on gas, D'Errico's car or truck in which his Emotional Support Dogs accompanied him constitutes a dwelling under the Fair Housing Act at 42 U.S.C. 3601 et seq,

186.    Because he was disabled, D'Errico was entitled under the Fair Housing Act to have his Emotional Support Dogs with him in his dwelling, even if that dwelling for part of the week was in the form of a vehicle.

187.    The deprivation of D'Errico's Emotional Support Dogs from his part time "dwelling" in the Walmart parking lot constituted a violation of D'Errico's right under the Fair Housing Act to have his Emotional Support Dogs with him.

39

188.    As a result of the frivolous ex parte seizure of D'Errico's dogs from his dwelling, D'Errico has suffered significant emotional and monetary damages.

COUNT VIII – VIOLATION OF HOBBS ACT AT 18 U.S.C.A. §1951

189.    D'Errico repeats and incorporates the allegations contained in ¶¶'s 1 96, above.

190.    Where D'Errico was intending to sell his Puppies in New Hampshire and Massachusetts, the Puppies constituted property for sale in interstate commerce as such term is defined in the Hobbs Act at 18 U.S.C.A. §1951.

191.    The abuse of the Maine Animal Welfare laws by the Defendants described herein, which abuse resulted in the permanent possession of D'Errico's dogs, constituted the taking of possession of D'Errico's dogs under either the color of law or by the threat of violence, as such terms are defined in the Hobbs Act.

192.    The frivolous ex parte seizure of D'Errico's dogs constituted an interference with interstate commerce by threats of violence or under color of law.

193.    Such interference with interstate commerce as described above constitutes a violation of the Hobbs Act.

194.    As a result of the Defendants violation of he Hobbs Act, Plaintiff has suffered severe emotional distress as well as significant monetary damages.

WHEREFORE, D'ERRICO RESPECTFULLY REQUESTS A TRIAL BY JURY ON ALL
MATTER SO TRIABLE

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant his Emergency Motion for Injunction against the Defendants:

40

1.      Ordering Defendants not to sell, transfer, give away, put up for adoption or otherwise dispose of D'Errico's dogs;

2.      Ordering the Defendants to transfer possession of all of D'Errico's dogs immediately to him.

3.      Award him damages for the numerous violations of his civil rights;

4.      Award him damages for his emotional suffering;

5.      Award him damages for the lost profits he would have made on the sale of the Puppies;

6.      Award D'Errico such other compensation for costs and damages as this Court deems just.

Respectfully submitted
By the Plaintiff


_____
Christopher D'Errico
25 Chalet Drive
Gilford, New Hampshire 03249
(781) 789-8989


## VERIFICATION

The undersigned states under the pains and penalties of perjury that the facts stated above are true and correct.

_____
Christopher D'Errico

41